James E. Cecchi, Esq.
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Attorney for Plaintiff and the putative Class*

[Additional Attorneys on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **STEVEN MOLNAR, Individually and on behalf of the Virtua Inc., 401(k) Plan and on behalf of all the similarly situated Participants and beneficiaries of the plan,** | **Case No. _____** |
|  | **JURY TRIAL DEMANDED** |
| **Plaintiff,** |  |
| **v.** |  |
| **VIRTUA HEALTH, INC.; and THE FINANCE & INVESTMENT COMMITTEE OF THE VIRTUA HEALTH, INC., 401(K) SAVINGS PLAN; John and Jane Does 1-30 in their capacities as members of the Administrative Committee,** | <u>**CLASS ACTION COMPLAINT**</u> |
| **Defendants** |  |

## <u>TABLE OF CONTENTS</u>

I.  NATURE OF THE ACTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................................... 2

III.  THE PLAN .......................................................................................................................... 3

IV.  THE PARTIES .................................................................................................................... 4

V.  FACTUAL ALLEGATIONS .............................................................................................. 6

    A.  The Committee Violated ERISA's Duty of Prudence. ........................................... 6

        1.  The Committee Lacked a Prudent Process in Selecting Plan Funds
           and Managers ................................................................................................. 6

           a.  The Committee Ignored their IPS Metrics in Selecting Funds
              and Fund Managers .............................................................................. 7

           b.  The Committee Ignored its IPS Metrics and Failed to Follow a
              Prudent Process with Regard to Target Date Funds ("TDF") ............... 12

           c.  Committee Lacked Prudent Process in Selecting Goldman Sachs
              Small Cap Value as a Plan Option ........................................................... 16

        2.  The Committee Lacked Prudent Processess in Montoring the
           Fund's  Performance ....................................................................................20

           a.  The Committee Failed to Monitor Fund Underperformance ................. 20

           b.  The Committee Failed to Monitor the Goldman Sacks Small
              Value Cap Fund ...................................................................................... 21

           c.  The Committee Failed to Monitor the MetWest Fund ........................... 24

           d.  The Committee Failed to Monitor the Plan's TDFs ............................... 26

    B.  Committee Breached its Duty of Loyalty by not Acting in the Sole Interest of the
        Plan Participants and by Failing to Pursue Financial Benefit for the Plan
        Participants .......................................................................................................... 27

    C.  Defendants Engaged in Prohibited Transactions by Allowing Excessive Advisory
        Payments. ............................................................................................................. 30

VI.  CLASS ACTION ALLEGATIONS ................................................................................ 34

VII.  TIMELINESS .................................................................................................................. 38

**COUNT I: Breach of Fiduciary Duty of Prudence** .................................................... 38

**COUNT II: Breach of Fiduciary Duty of Loyalty** .................................................... 40

**COUNT III: Breach of Co-Fiduciary Duties** .................................................... 43

**COUNT IV: Breach of Fiduciary Duty of Prudence** .................................................... 44

**COUNT V: Violation of 29 U.S.C. § 1106(a) Prohibited Transactions** .................................................... 46

**COUNT VI: Violation of 29 U.S.C. § 1106(b) Prohibited Transactions** .................................................... 48

**VIII.  PRAYER FOR RELIEF** .................................................... 50

## I.  NATURE OF THE ACTION

1.      Plaintiff Steven Molnar ("Plaintiff") individually, and on behalf of all others similarly situated participants, their beneficiaries and estates,, and on behalf of Virtua Health 401(k) savings plan ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a) (2) and (3) & 409(a) against Defendants (1) Virtua Health, Inc., ("Virtua"), (2) the Employee Benefits Plan & Investment Committee of Virtua Health, Inc., 401(K) Plan ("Committee"), (3) John Does 1-30 in their capacities as members of the Committee (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), U.S.C. 29 1001, *et seq*.

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3.      As fiduciaries to the Plan, Defendants were obligated at all times to act (1) prudently and (2) for the exclusive benefit of participants and beneficiaries. These Defendants did not because they consistently selected higher cost and worse performing investment options that reduced Plan participants' retirement funds as compared to if Defendants did not breach their fiduciary duties.

4.      Plaintiff brings this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(a), 29 U.S.C. § 1132(a).

6.      Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Plaintiff resides in this District and worked for Defendant Virtua in this District.

### III. THE PLAN

7.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

8.      According to its Investment Policy Statement ("IPS"), the Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through employee contributions and, if applicable, employer contributions, as well as associated investment earnings.

9.      The Plan is a defined contribution plan covering all eligible employees of Virtua Health Inc. ("Virtua"), except bargaining unit employees represented by JNESO.

10.     The Human Resources Department of Virtua controls and manages the operation and administration of the Plan. The Committee has fiduciary responsibility for the investment of the assets of the Plan. Lincoln Financial Group Trust Company, Inc. serves as the directed trustee of the Plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). UBS Financial Services (UBS) and Graystone Consulting/Morgan Stanley also act as fiduciaries as the term is defined in Section 3(21) of ERISA with respect to any investment advice. Participants have the option of directing their investments into LifeSpan® Risk-Based, Target-Date Model Portfolios.

11.    At all relevant times, the Plan permitted participants to allocate their retirement assets into about two dozen portfolio-building, non-Target Date pre-selected investment options.

12.    At all relevant times, the Plan qualified as a large plan. The Plan Sponsor managed approximately $650,000,000.00 to $990,000,000.00 from 2019 to 2023.[1]

13.    The assets of the Plan are held by Lincoln Financial Group Trust Company, Inc. ("Lincoln").

## IV. THE PARTIES

14.    At all relevant times, Plaintiff Steven Molnar, by virtue of his employment with Virtua and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Plaintiff is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Plaintiff was invested in the 2025 and 2030 series of Defendants LifeSpan Models. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff was subject to excessive fees, underperformance, and suffered financial losses.

15.    At all relevant times, Defendant Virtua Health, Inc., a large company with over 14,000 employees, providing health services, including rehabilitation,

---

[1] According to the Virtua's filed 5500 forms.

home health, and paramedic services, is the sponsor of the Plan per ERISA §
3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29
U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. §
1002(2)(A), to the extent that it appointed members of the Committee and otherwise
exercised discretion over the administration and management of the Plan and/or
control of Plan assets.

16.     At all relevant times, the Committee was the Plan administrator under
ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A),
29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. §
1002(21)(A), to the extent that it had or exercised discretion over the administration
or management of the Plan and/or control of Plan assets**.**

17.     At all relevant times, Defendants John Does 1-30, as members of the
Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. §
1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. §
1002(21)(A), to the extent that they had or exercised discretionary authority
respecting the administration or management of the Plan, and/or control of Plan
assets. Plaintiff will seek leave to amend the Complaint to name each of these John
Does once they ascertain their identities in discovery. The Committee and John Does
1-30 will be referred to collectively as the "Committee."

## V. FACTUAL ALLEGATIONS

**A.    The Committee Violated ERISA's Duty of Prudence.**

**1.    The Committee Lacked a Prudent Process in Selecting Plan Funds and Managers**

18.    An ERISA fiduciary has a duty to create and follow prudent processes in selecting plan funds and managers.

19.    In selecting funds for a plan, fiduciaries must "avoid unwarranted costs" by being aware of the alternative investments that may have "significantly different costs." RESTATEMENT (THIRD) OF TRUSTS Ch. 17, intro. note (2007); *see also* RESTATEMENT (THIRD) OF TRUSTS § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir.), *cert. denied*, 519 U.S. 810 (1996).

20.    Adherence to these duties requires analyzing statistical metrics of past risk-adjusted performance of funds and their managers and comparing them to available alternatives to determine whether a particular fund is appropriate for addition to the plan or if superior alternative investments are available.

21.    An examination of the cost and fee structure of the funds selected for the Plan shows that the Committee did not have a viable methodology for selecting funds or controlling the costs and expenses of its investment options. Modern

Portfolio Theory (MPT), Prudent Investor Rule (RESTATEMENT (THIRD) TRUSTS) and ERISA's prudent expert standards required the Committee to have a prudent methodology for making sure participants' money was spent wisely.

22.     As described below, the Committee failed to institute, follow, and apply processes that are consistent with the competence, skill, effort, and diligence that is required of a prudent fiduciary because the Committee persistently selected funds carried higher costs and lower returns than available alternatives.

### a.     The Committee Ignored their IPS Metrics in Selecting Funds and Fund Managers

23.     The IPS describes the Committee's members' decision-making guidelines. Appendix B of the IPS states that the Committee should focus on key areas for their investment selections and retentions such as "Active Evaluation Criteria" and review and consider in selection of funds and managers whether "[m]anager tenure greater than or equal to 3 years" as well as "3 year performance greater than 50% of peers" along with "5 year performance greater than benchmark" and ". . . greater than 50% of peers."

24.     The IPS also guides the Committee to consider 5 year and 10 year Sharpe Ratio greater than 50% of peers. Finally, the Committee's decision-making should also focus on lower "Net Expense Ratios" and whether the mutual funds' "Investment Style" was "consistent with the fund's objectives." Standard deviation should be used to investigate investment risk.

25.    Evidence from the certified reporting to the U.S. Departments of Treasury and Labor (www.efast.dol.gov; Annual Return/Report of Employee Benefit Plan (Form 5500) for plan years 2009 to 2023) indicates the Committee's selections and actions over a long period of time demonstrate that they failed to follow their IPS and any prudent process in selecting investments, funds and their related managers.

26.    Over 90% of the Committee's selection from 2007 to 2018 didn't conform with their IPS and over 80% from 2019 to 2022. The Committee selected these funds even though they clearly and demonstrably underperformed due to high costs, high risks and low returns in the past.

27.    The fact that the Committee consistently selected funds with dismal statistical metrics in violation of common sense and their IPS guidelines demonstrates that a plan-wide imprudent process was at play.

28.    The Committee's failure to act, ignorance, and or inability to follow a prudent process and their IPS metrics is best illustrated by the Committee's imprudent and inexplicable decisions surrounding the selection and retention of the Metropolitan West Total Return Bond Fund ("MetWest").

**Table 1: MetWest bond fund's excessive turnover costs.**

| Year & Turnover % | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MetWest Bond | 426 | 467 | 470 | 405 | 255 | 291 | 313 | 303 | 255 | 160 | 160 |
| Corporate Bond Average | 70 | 57 | 64 | 77 | 66 | 55 | 58 | 64 | 74 | 68 | 68 |

29.    For more than a decade the MetWest bond exhibited high turnover costs, at least double the bond average and often times triple and quadruple.

30.    Extraordinarily, the MetWest fund manager traded at over 100% of its investment portfolio each year. In essence, this means the fund managers changed their minds as to their selections of bonds a lot more often than is common in the industry, second guessing and turning over their portfolio constantly. [Each turnover carries a cost for the transaction, selling the original selection and purchasing a new one. Therefore, high turnover increases costs, which then in turn elevates the risk of the investment because unless the additional costs are offset by better performance these costs erode the investment returns.

31.    Nevertheless, even though the MetWest fund manager proved a lack of skill with his track record of excessive turnover costs and risk, the Committee nonetheless selected (and retained) this fund as an option for their Plan participants

causing the participants to pay extremely high turnover costs for predictably low returns.

32.     ERISA prescribes that a prudent investor must minimize costs of a plan because costs erode returns and growth. Even a small increase in costs can substantially erode returns over a long period of time, which is why it is paramount, and the law, to analyze and consider costs when selecting investment options.

33.     Different investment alternatives chosen by the Plan's fiduciaries have different fees. Investment fees are daily charges against the investors' returns associated with managing and operating the funds, and they also provide compensation to third parties of a retirement plan. Because a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement, fiduciary decisions affecting fees can dramatically affect the amount of money that participants are able to save for retirement.

34.     Here, the Committee consistently failed to minimize costs and signed up the Plan participants to pay excessively high turnover costs associated with MetWest's Bond Fund, which resulted in millions of dollars of growth lost for the Plan participants.

35.     In addition to extremely high turnover costs, MetWest is also a managed fund that carries fifty basis points (0.5%/year) in annual expenses for manager compensation. Additional costs are not per se a problem, but the additional active

management cost must carry a payoff over and above those additional costs when compared to an unmanaged fund.

36.    However, an examination of MetWest's performance makes it clear that it did not outperform its peers under either the Committee's IPS metrics or just general sound industry-standard selection criteria. To make matters worse, MetWest not only failed to outperform passively managed funds but also performed dismally in comparison with its peers.

37.    Back in 2015 when MetWest was selected, analyzing its past performance revealed that from 2010 to 2014, MetWest's peers averaged returns of 6.87% per year, while MetWest earned only 0.45% per year.

38.    A ten-year lookback period reveals similarly poor historical performance of the MetWest fund. MetWest averaged 1.75%, while its peers averaged 5.42%.

39.    The Committee nevertheless imprudently selected this fund despite the MetWest fund carrying excessively high turnover costs and substantially lower performance than its peers for years and years in violation of their IPS and sound selection and retention factors.

40.    At all relevant times, the Committee could have selected any of MetWest's average performing peers and earned the participants millions of dollars of additional bond interest and growth.

41.    Unfortunately, the Committee's inexplicable poor judgment in selecting MetWest is not an outlier in the Plan's portfolio. The Committee consistently selected funds with terribly high costs and poor performance due to a lack of prudent processes that would prevent these predictably poor selections.

### b.    The Committee Ignored its IPS Metrics and Failed to Follow a Prudent Process with Regard to Target Date Funds ("TDF")

42.    The Committee's systematic and consistently imprudent choices are also reflected in the Committee's target date fund offered to Plan participants.

43.    As the TDF option, the Committee selected and offered LifeSpan Models[2] that performed 5.02% worse than the average TDF mutual fund in 2019.[3]

44.    Nevertheless, the Committee offered this TDF as an option in violation of its IPS and prudent processes and offered this grossly underperforming option as compared to the average peer to its Plan participants.

45.    The TDF options of the Plan were infested with selections defying common sense, prudent processes, and the Committee's IPS.

---

[2] Plaintiff Molnar wages were allocated in this option
[3] Lifespan returned 13.45% during 2019 as compared to the average TDF returning 18.47% during 2019.

46.    For example, due to the same lack of prudent processes in selecting funds and managers, the Committee selected American Funds Europacific Growth as part of the LifeSpan Models in 2021.

47.    A prudent investigation before the selection/retention of this fund would have revealed the fund was not in compliance with (1) the prudent man rule of ERISA, (2) the RESTATEMENT OF THE LAW THIRD TRUSTS (avoid unwarranted costs), and the (3) Defendants' own IPS requirements.

48.    Thus,  adding this fund to the Virtua participants' limited menu of investment choices and inclusion  in the Lifespan models was reckless.

49.    Based on the real-time facts and circumstances prevailing during the Committee's initial selection conduct, the geometric mean showed a loss of one hundred and fifty-one basis points each year over the earlier three years of 2020, 2019, and 2018.

50.    In that same vein, the fund's performance lagged behind peers.  As compared to its geometric mean loss, the fund's alpha ratio in the Foreign Large Growth Category Average (*i.e.*, the average return of comparable funds against the benchmark) was 38 basis points over the prior five years and 42 basis points over the prior 10 years (data that was available at the time of selection of this fund by the Committee).

51. Likewise, the Committee's selection also lagged behind its peers in Treynor ratio. The worse the Treynor ratio, the higher the risk of the investment.

**Table 2: 2020 Treynor Ratio for American Funds Europacific**

| As of 1/1/2020 (lower is worse) | Treynor 1-year | Treynor 3-year | Treynor 5-year | Treynor 10-year | Relative Risk 1-year | Relative Risk 3-year |
|---|---|---|---|---|---|---|
| Foreign Large Growth Average | 30.81 | 13.6 | 7.45 | 6.55 | 0.88 | 0.96 |
| American Funds Europacific Growth R5 | 25.19 | 10.27 | 6.72 | 6.46 | 1.00 | 1.01 |

52. Moreover, this fund carried higher turnover costs that should have tipped the Committee off that this was not a prudent inclusion.

53. Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds. In that sense, they are also a form of a measure of risks associated with the investment because these additional transactions carry additional costs. The higher the costs, the higher the performance must be to merely go even with lower cost options.

54. The American Funds Europacific Growth had significant and material turnover for a prolonged amount of time. The fund's turnover rates averaged 31.4 percent over the previous eleven years. This substantial turnover created transaction costs for the participants over and above the portfolio manager's compensation. This

fund's performance could not justify these additional, unnecessary costs, which the Committee should have recognized.

55.    Generally, a turnover rate above 30% warrants close analysis by plan fiduciaries as it can suggest that the manager is not following a disciplined investment strategy.

**Table 3: American Funds Europacific Ten Year Turnover rates**

| Turnover Rate (>30 is costly) | '23 | '22 | '21 | '20 | '19 | '18 | '17 | '16 | '15 | '14 | '13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| American Funds EuroPacific Growth | 34 | 29 | 32 | 38 | 35 | 29 | 36 | 30 | 28 | 27 | 27 |

56.    Nevertheless, the Committee still selected this fund in violation of its IPS due to the same lack of prudent process.

57.    A Committee that follows a prudent process would not consistently, and almost exclusively, select higher cost and lower performing options for its Plan participants.

### c.     Committee Lacked Prudent Process in Selecting Goldman Sachs Small Cap Value fund as a Plan Option

58.     Goldman Sachs Small Cap Value is one of the Plan's oldest investments, demonstrating that the imprudent process began a long time ago and persisted to the present.

59.     This fund was selected/retained by the Committee on or before their first electronic reporting to the government for the 2009 calendar year (the first of the Defendant's electronic certifications/filings to the U.S. Departments of Treasury and Labor). On 12/31/2009, the fund held $1,957,577 in participants' savings. At the end of 2019, it contained $17,193,566 of Plan participants' saved wages.

60.     However, the Goldman Small Cap *Value* fund should never have been added in 2009 or later. In the plan year 2009, the Goldman fund violated the "Active Evaluation Criteria" of the IPS Appendix B (page 10) because it was not a "Value" mutual fund—it was a "Blend" of value stocks and growth stocks.

61.     Also, in the plan year 2009, the alpha was negative or a loss versus the fund's appropriate broad-based securities market index over the prior five and ten years. Over five years the Morningstar US Small Value TR USD benchmark earned 2.13%/yr but the Goldman Small Cap Value fund's return was negative -0.18%, and over ten years the benchmark made 10.2%/yr while the Goldman fund gained 9.6% per year.

62.    In essence, this means that investors in this fund paid additional management fees to receive lower returns than the cheaper, unmanaged benchmark index.

63.    The Goldman Small Cap Value fund's name has been small value since its inception, but from 2013 to 2018, the portfolio manager deviated from that sector and only held an average of 27% in value stocks. This style drift violated page 6 of the IPS, but again, the Committee did not have prudent processes at play to notice this and the other reasons to avoid the Goldman portfolio manager.

64.    The Committee sat idly by as the Plan participants spent almost $2M in fees for the Goldman portfolio manager to try and beat the appropriate broad-based securities market index—which it predictably did not. At no point in time did the Committee have any reason to believe that this manager and fund would actually beat the substantially less expensive benchmark given this fund's historical performance as outlined above. Nor did the Committee notice or care that the manager continued to fail to beat the benchmark after retaining this fund.

65.    The Committee egregiously failed to avoid unwarranted and unnecessary costs and failed to prudently investigate the potential of the participants' extra costs to produce enhanced returns for them and the Plan and Trust.

66.    The RESTATEMENT OF THE LAW OF TRUSTS (THIRD) warns that if the extra costs and risks of an investment program are substantial, these added costs and

risks must be justified by realistically evaluated return expectations. Here, given this

manager's historical performance, there was no justification for extra costs and risks.

**Table 4: Participants' total cost for the Committee's Goldman choice.**

| Plan year (Goldman added to menu before 2009) | *Goldman Sachs SCV Participants' $* | SEC Turnover costs | SEC Fund costs |
|---|---|---|---|
| 2023 | *$11,111,619.00* | $30,001.37 | $110,005.03 |
| 2022 | *$11,189,347.00* | $38,043.78 | $107,417.73 |
| 2021 | *$13,465,872.00* | $64,636.19 | $127,925.78 |
| 2020 | *$18,975,779.00* | $96,776.47 | $180,269.90 |
| 2019 | *$17,193,566.00* | $68,774.26 | $159,900.16 |
| 2018 | *$13,725,359.00* | $71,371.87 | $127,645.84 |
| 2017 | *$17,203,304.00* | $58,491.23 | $163,431.39 |
| 2016 | *$10,619,471.00* | $36,106.20 | $97,699.13 |
| 2015 | *$9,977,642.00* | $45,897.15 | $94,787.60 |
| 2014 | *$7,646,481.00* | $43,584.94 | $74,935.51 |
| 2013 | *$11,128,589.00* | $63,432.96 | $109,060.17 |
| *Cost grand total: $1,970,194.66* | **$142,237,029** | $617,116 | $1,353,078 |

67.    These egregious oversights are indicative of the Committee failing to

implement or follow prudent processes at all relevant times.

68.     After over a decade of underperformance, the first time the fund was discussed in the Committee's meeting minutes was in October of 2021. Somehow, the evident 2009 to 2020 period of underperformance and attendant risks of future underperformance were not mentioned.

69.     The best metric to judge portfolio manager risk versus reward is a fund's information ratio. The Goldman Small Cap Value fund's average information ratio (IR) in 2009, over the prior five years, was near zero (0.014).

> Information ratio measures the fund's performance relative to its benchmark and adjusts it for market volatility. **If the ratio is between 0.61 and 1, then it is a great investment.** Information ratio is extremely useful in comparing a group of funds with similar management styles.[4]

70.     This metric measures an investment's performance relative to its benchmark and adjusts it for market volatility. The Goldman Small Cap Value's information ratio (IR) from 2018 back to 2013 was -0.590, -0.050, 0.040, 0.130, 0.550 and 0.450, respectively. If the portfolio manager's ratio lies between 0.61 and 1, then it is a great investment. Hence, the Goldman fund was not. The Committee failed to notice that this fund never achieved a good IR and also failed to notice the tremendous downward trending, free fall of this fund into negative IR range. From

---

[4] https://www.financialexpress.com/money/mutual-funds-what-information-ratio-tells-about-your-fund-managers-performance-1512745/#:~:text=Information%20ratio%20measures%20the%20fund%E2%80%99s%20performance%20relative%20to,a%20group%20of%20funds%20with%20similar%20management%20styles.

2013 to 2018, Goldman's average information ratio (IR) over the prior five years was not even close to the range of 0.61 to 1.

71.    Unsurprisingly, this trend continued and the IR never recovered from negative numbers. From 2023 back to 2019 the IR of this Goldman fund was -0.61, -0.600, -0.910, -0.680 and -0.610, respectively. Thus, the fund should never been added or retained on the participants' menu and/or should have been swiftly eliminated upon imprudent selection.   Much to the disappointment of the Plan participants, neither action was taken by the Committee. In fact, in addition to failing to follow prudent processes in selection, the Committee also utterly failed to monitor their selections and remove imprudent ones.

### 2.    The Committee Lacked Prudent Processes in Monitoring the Fund's Performance

#### a.    The Committee Failed to Monitor Fund Underperformance

72.    After consistently selecting less favorable and imprudent options for their Plan participants, the Committee also failed to recognize and remedy these selections, or deliberately disregarded its past mistakes.

73.    The duty to monitor requires that plan fiduciaries "systematic[ally] conside[r] all the investments . . . at regular intervals to ensure that they are appropriate." *Tibble v. Edison Int'l,* 575 U.S. 523 (2015) (quoting A. Hess, G. Bogert, & G. Bogert, LAW OF TRUSTS AND TRUSTEES § 684, at 145-46 (3d ed. 2009)).

74.    The Committee allowed Plan participants to continuously invest their wages in more expensive and lower performing options on a plan-wide basis causing the Plan participants to lose millions of dollars.

> **b.    The Committee Failed to Monitor the Goldman Sachs Small Value Cap Fund**

75.    The Committee's lack of a prudent process, compliance with ERISA, and violation of fiduciary duties in monitoring the Plan's investments is best illustrated by the Committee's failure to recognize the decade long underperformance of its selected Goldman Sachs Small Value Cap fund.

76.    If the Committee followed the IPS metrics and reviewed its Goldman Sachs Small Value Cap fund at anytime, it should have come to the clear conclusion that this fund needed to be removed.

77.    The Defendants' limited menu included the Goldman Sachs Small Cap Value from 2009 to 2023. This fund's style drift or deviation of investments were noted in seven instances in the 89 pages of the Defendants' minutes but they failed to note IPS criteria number 10 when evaluating thestyle deviation of this Goldman fund. The IPS Appendix B criteria number 10 "Investment Style is consistent with the fund's objectives" requires the style to match the prospectus objective. The fund's drift or deviation was present for over a decade. The Committee demonstrated either that they are unaware of their IPS guidelines or that they chose to disregard them.

78.    Just like the style drift of this fund, the Committee also did not notice that this fund continuously underperformed its benchmark[5].

### Table 5: 2019 Lookback at Goldman Sachs Small Cap Value Benchmark Underperformance

| Name (data as of 1/1/2019) | Treynor 1-year | Treynor 3-year | Treynor 5-year | Treynor 10-year |
|---|---|---|---|---|
| S&P SmallCap 600 TR USD | -9.13 | 6.80 | 5.08 | 11.19 |
| Goldman Sachs Small Cap Value R6 | -16.17 | 4.63 | 3.09 | 10.52 |

79.    The Goldman fund consistently underperformed its benchmark for ten years; and using all historically available information going back even further from 1995 to 2018, the mean loss to the appropriate broad-based securities market index was -1.66% each year.

80.    Basic prudent analysis would have revealed to the Committee that this Goldman fund never performed well enough to warrant inclusion in the Plan in the last thirty years. Not only did the Committee fail to notice this fact at the time of selection but it continued to fail to notice this fact at all relevant times thereafter and allowed this fund to erode the growth of the Plan.

81.    Any prudent monitoring process would have compelled the Committee's members to remove this imprudent fund in 2019 or before. The same

---

[5] The IPS in Appendix A states that the "Peer group and Corresponding Market Index" is used to measure the performance of this type of fund.

fact pattern of losses to the benchmark was carried into the 2020 plan year as well as through all successive years up to September 30, 2024.

82.     Keeping this investment lost Plan participants millions in losses versus the Goldman fund's appropriate broad-based securities market index benchmark. For example, the Goldman fund lost $2,867,832 from 2019 to 2024 in growth when compared to its benchmark. The Committee stood idly by as this lost growth compounded for more than a decade and did not have systems in place to monitor and prevent such disastrous outcomes.

83.     In 2019, Participants invested wages equaled $17,193,566. From 2019 until September 30, 2024, the Goldman fund returned 8.20%/yr versus 10.74%/yr for the fund's appropriate broad-based securities market index matching its strategies and objectives (S&P SmallCap 600 TR USD).

84.     Additionally, the Goldman fund's style drifted out of value into growth and blend stocks, which meant over the years of 2019 to 2023, the value style equaled only 29% as opposed to the required minimum 45%.

85.     The Committee's failure to notice the style drift and more than a decade of underperformance further demonstrates that the Committee lacked oversight and prudent monitoring processes to identify imprudent investments.

### c.  The Committee Failed to Monitor the MetWest Fund

86.     Another example of the same lack of prudent monitoring processes of the Committee is the retention of the MetWest fund as both a direct option and as part of the Lifespan models for Plan participants.

87.     After imprudently adding the MetWest fund in 2015, the Committee failed to monitor this plan at all relevant times.

88.     In 2019, the Metropolitan West Total Return Bond Fund's managers' alpha or performance lagged behind their peers by a median of 63 basis points per annum (-0.63%) for plan years 2018 back to 2014.

89.     From the plan year 2018, back ten years to the 2009 plan year, the managers lagged behind peers again by a loss of one hundred and fifty-one basis points (-1.51%) each year. Geometric mean returns were worse at a loss of 67 basis points (-0.67%) over the earlier five years (2018 back to 2014) to peer bond funds (Corporate Bond Cat. Avg) and a loss each year of 395 basis points (-3.95%) to peers annually over the prior ten years.

90.     Yet again, because the Committee failed to follow prudent processes in monitoring investment options of the Plan participants, they were unable to discover or disregarded this consistent underperformance.

91.     Impact of the Committee's plan-wide imprudent decision-making and failure to monitor cannot be overstated.

92.    The Plan and Trust held $73,052,523 on January 1, 2019 (of participants' retirement saving balances in Virtua's Plan in the Metropolitan fund). From January 1, 2019 to September 30, 2024, the participants' dollars in the Metropolitan West Total Return Bond Fund returned $6,120,152 less than the Corporate Bond Cat. Avg. The geometric mean alpha over the period was a loss of 1.34% each year for almost six years.

93.    Thus, participants in this fund would collectively have over six million dollars more in their accounts but for the Committee's initial thoughtless and poor decision-making after the plan year 2019, and even more when going back to the fund's inclusion in 2015. The Committee's failure to both prudently select and prudently monitor costs caused Plan participants to lose out on benchmark growth, and particular older bond fund investors who sought safety over growth.

### d.    The Committee Failed to Monitor the Plan's TDFs

94.    The Committee's failure to follow prudent processes in selection and monitoring their selections similarly damaged the Plan's TDFs.

95.    The Committee's TDF selection consistently lagged behind its peers.

**Table 6: The 2025 Lifespan Model v. Peers**

| Defendants' 2025 Model versus Peers (as of 12/31/2019) | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| Target-Date 2025 Peer Average | 4.80 | 18.47 | 18.47 | 8.84 | 6.40 |
| **Loss/Difference** | **-1.36** | **-5.02** | **-5.02** | **-2.07** | **-0.51** |

| Defendants' 2025 Model versus Largest Peers (as of 12/31/2019) | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| American Funds 2025 Trgt Date Retire R6 | 5.65 | 17.85 | 17.85 | 9.47 | 7.12 |
| **Loss/Difference** | **-2.21** | **-4.40** | **-4.40** | **-2.70** | **-1.23** |

| Defendants' 2025 Model versus Largest Peers (as of 12/31/2019) | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| T. Rowe Price Retirement 2025 | 5.80 | 20.95 | 20.95 | 10.34 | 7.60 |
| **Loss/Difference** | **-2.36** | **-7.50** | **-7.50** | **-3.57** | **-1.71** |

| Defendants' 2025 Model versus Largest Peers (as of 12/31/2019) | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%)" | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |

| Vanguard Target Retirement 2025 Inv | 5.22 | 19.63 | 19.63 | 9.57 | 6.99 |
|---|---|---|---|---|---|
| **Loss/Difference** | **-1.78** | **-6.18** | **-6.18** | **-2.80** | **-1.10** |

96.    The Committee's selection consistently lost out to its peers and underperformed the peer average, and like across the other options included in the plan, on a plan-wide basis, the Committee lacked prudent processes to monitor and identify when action was required of them to stop the bleeding.

97.    The Committee's process was consistently tainted with failure of effort, competence, or loyalty on a plan-wide basis.

98.    The damage caused to Plan participants by the imprudent processes of the Committee in the TDF sector is immense, approximately $30 million to $35 million dollars[6].

**B.    Committee Breached its Duty of Loyalty by not Acting in the Sole Interest of the Plan Participants and by Failing to Pursue Financial Benefit for the Plan Participants**

99.    Under ERISA's duty of loyalty, a plan fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of benefitting them. 29 U.S.C. § 1104(a)(1)(A)(i). This sole interest rule is a codification of what is found in the common law of trusts. It

---

[6] The exact amount of damages caused by the Committee's imprudent decisions surrounding TDFs can be calculated, however, at this time Defendants have denied Plaintiff's request for totals in each Lifespan model.

creates a very specific and narrow path for an ERISA plan manager when considering an investment strategy or providing mutual fund selections for self-directed individual accounts. ERISA fiduciaries have a duty to the beneficiaries and participants not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the ERISA plan— they must act with an "eye single" to the interests of the plan participants. RESTATEMENT (THIRD) OF TRUSTS § 78(1) cmt. F. (Am. Law Inst. 2007). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interest of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." An ERISA plan manager who is influenced by his own or a third party's interests is disloyal because the ERISA plan manager is no longer acting solely in the interests of the beneficiaries. Here, the Committee consistently selected and kept underperforming funds that carried high manager fees for inexplicable reasons. The Committee's actions were not in the sole interest of plan participants and beneficiaries and thereby violated the duty of loyalty.

100.   When the Committee acts to benefit anyone else outside of the Plan participants it is breaching its duty of loyalty.

101.   Similarly, the Committee failed and ignored its duty to pursue financial benefits for the Plan participants.

102.   Based on the U.S. Supreme Court's interpretation of the statutory language, "providing benefits to participants and their beneficiaries," a fiduciary's duty of loyalty also requires an exclusive focus on the pursuit of financial benefits:

> "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." Read in the context of ERISA as a whole, the term "benefits" in the provision just quoted must be understood to refer to the sort of financial benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries.

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420-21 (2014) (quoting 29 U.S.C. § 1104(a)(1)(A)(i)-(ii)). "The term ['benefits'] does not cover nonpecuniary benefits." *Id*. at 421. Therefore, ERISA's duty of loyalty mandates the pursuit of financial benefits for the plan participants and beneficiaries and does not allow for the pursuit of nonfinancial or nonmonetary benefits, even if plan participants and beneficiaries approve.

103.   This means that even if ERISA plan documents state that other objectives could or must be pursued, such as cleaning up the environment, raising labor wages, excluding investments that involve alcohol, guns, or tobacco, etc., making the workplace safer, providing better medical benefits for employees, or solving the world's social or political problems, no matter how worthy the objective, this conflicts with ERISA's fiduciary duties and is void as a matter of public policy. *See Fifth Third Bancorp*, 573 U.S. at 421 ("With irrelevant exceptions, 'any provision in an agreement or instrument which purports to relieve a fiduciary from

responsibility . . . for any . . . duty under this part shall be void as against public policy'") (citing 29 U.S.C. § 1110(a)).

104.   To comply with its fiduciary duties, an ERISA plan manager must have the sole focus of pursuing the highest risk-adjusted financial return possible for plan participants and beneficiaries. If this does not occur because the Committee selected funds and managers with excessive fees and poor performance, the Committee breaches its fiduciary duty of loyalty.

105.   Here, the Committee consistently selected and kept options with excessive fees and poor risk adjusted return.

## C.    Defendants Engaged in Prohibited Transactions by Allowing Excessive Advisory Payments.

106.   Prohibited transaction claims under ERISA § 406(a) are "per se violations of ERISA.

107.   When selecting investments for a retirement plan, plan fiduciaries are required to: act with undivided loyalty and prudence; and defray reasonable plan expenses. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). In addition, ERISA prohibits certain transactions and arrangements that have a high potential for abuse. Thus, ERISA prohibits a fiduciary from causing a plan to transact with a party in interest, such as the plan sponsor, and prohibits plan fiduciaries from causing plan transactions for the benefit of themselves or others. ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

108.  Prohibited transaction claims under ERISA § 406(a) are "per se violations of ERISA" and, thus, not derivative of breach of fiduciary duty claims. *Liss v. Smith*, 991 F. Supp. 278, 307 n.30 (S.D.N.Y. 1998). Likewise, ERISA § 406(b) is broadly construed and "liability be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith[.]'" *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (quotation omitted).

109.  Fiduciary status is determined broadly by function, not title; also:

. . . The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: . . . attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio

mix or with regard to specific investments and receive a fee for these services; . . . [and] . . . stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of these securities and receive a commission for their services. (Footnotes omitted.)

Little and Thrailkill, FIDUCIARIES UNDER ERISA: A NARROW PATH TO TREAD, 30 Vanderbilt L.Rev. 1, 4-5 (1977)).

110.    Based on the IPS and meeting minutes here, the Financial Industry Regulatory Authority ("FINRA") individual representative worked in 2018 to 2023 as the advisor of record and all his services were the same.[7] Also, based on Virtua's governmental reporting, the Schedule C services were no different (UBS first hired in 2010). Their services were fiduciary in nature.

111.    Based on Fee Benchmarker® (ADVISOR FEE ALMANAC, 6th Edition, 2017), the maximum principal hourly rate is $300. This Plan and Trust holds about two dozen investments (nine of which changed from 2018 to 2023). Nine investment changes occurred since 2018 so that equals two changes per year. The average time for a Registered Investment Adviser (RIA) firm to research a replacement is about one business day, or eight hours. Reviewing two dozen investments takes about two hours each or a total of 24 hours. Twenty-four hours for existing Virtua funds per

---

[7] This is typical for the industry.

quarter plus the four hours for changes (2 funds times 8 divided by 4 quarters) equals 32 hours or $9,600 (32 times 300).

112.   ERISA only allows trust deductions for a covered service provider if they are necessary for the plan's operation. If necessary, covered service providers can be paid from the trust at a reasonable rate of pay. Even if given a pass for necessity,   here the covered service providers were paid twice the ~$40,000 highest rate in the industry for the specific services provided here. Non-principals are paid only $160 per hour, and most of the work here is performed by non-principals. The Committee inexcusably authorized double of that to be charged against the Plan participants.

113.   At all relevant times, Defendants (and UBS/Morgan Stanley) were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. Defendants who are or were fiduciaries to the Plan during the Class Period have violated their fiduciary duties and engaged in prohibited transactions with Plan assets.

## CLASS ACTION ALLEGATIONS

114.    Plaintiff brings this action on behalf of himself and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Virtua or is or was a partner, officer, director, or controlling person of Virtua; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Virtua; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

115.    The Class Period is from January 1, 2019, through the date of judgment.

116.    The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

117.    Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

118.    Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

119.    Plaintiff will fairly and adequately represent and protect the interests of the Class.

120.    Plaintiff do not have any interests antagonistic to or in conflict with those of the Class.

121.    Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

122.    Plaintiff are represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

123.    The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or

varying adjudications that would establish incompatible standards of conduct relating to the Plan.

124.   The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

125.   The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transaction and breaches of fiduciary duties which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief

126.   The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

127.   A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

128.   Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## TIMELINESS

129.   Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

130.   At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

131.   At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches and prohibited transactions to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

132.   Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action.

133.   Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

## COUNT I: Breach of Fiduciary Duty of Prudence
### (against the Committee and John Does 1-30)

134.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

135.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

136.   ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

137.   As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim

138.   At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

139.   Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-

party service providers; (b) their selection and retention of investment options were prudent; and (c) Plan expenses were reasonable and necessary.

140.   At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

141.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

142.   In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

### COUNT II: Breach of Fiduciary Duty of Loyalty
### (against the Committee and John Does 1-30)

143.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

144.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised

discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

145.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id*.

146.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display … complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id*. at 224 (quotation marks and citations omitted).

147.    "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

148.   At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as described above by consistently choosing worse investment options for the Plan participants benefiting third parties with unreasonably high fees.

149.   The Committee failed to only act with the exclusive purpose of providing benefits to participants by allowing unnecessary costs and excessive costs diminish Plan participants retirement funds.

150.   The Committee failed to only act with the exclusive purpose of providing benefits to participants by choosing less economically favorable options in benefitting third parties with unreasonably high fees.

151.   As a direct and proximate result of their breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

152.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

153.   In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

## COUNT III: Breach of Co-Fiduciary Duties
## (against the Committee and John Does 1-30)

154.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

155.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

156.   Each Defendant had the data and information available to them to discover or stop the fiduciary breaches.

157.   Each Defendant knew and had the necessary data and information available to them to know of persistent manager underperformance, excessive risks, excessive manager costs, and opportunities for better performing investments.

158.   Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

159.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and

knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV: Breach of Fiduciary Duty of Prudence
## (against Virtua)

160.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

161.   Defendant Virtua is the Plan Sponsor as defined by ERISA. 29. U.S.C. § 1002(16)(B). Defendant Virtua appointed individuals to serve on the Committee. Committee members served as fiduciaries of the Plan and at the discretion of Defendant Virtua. Defendant Virtua, at all relevant times, was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

162.   Defendant Virtua, as the appointing fiduciary, had a duty to monitor the Committee at regular intervals to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

163. Defendant Virtua also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the

information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant Virtua.

164.   Defendant breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's expenses and investments were evaluated; and (c) failing to remove the Committee as a fiduciary whose performance was blatantly inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, ignored its IPS in selection of funds and managers, and caused the Plan to pay excessive fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

165.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant Virtua complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

166.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant Virtua is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT V: Violation of 29 U.S.C. § 1106(a) Prohibited Transactions
## (against the Committee and John Does 1-30)

167.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

168.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

169.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

170.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

171.    All of the Defendants are or were both a fiduciary and a party-in-interest subject to ERISA § 406(a)(1)(C), (D).

172.   The Committee's inclusion of and failure to remove the imprudent funds in the Plan described above amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

173.   The Committee's decision to agree to excessive fees to third parties such as fund managers and others as described amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

174.   The Committee's agreeing to pay excessive fees to managers of funds amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

175.   To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) and (D) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

176. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## COUNT VI: Violation of 29 U.S.C. § 1106(b) Prohibited Transactions

177. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

178. ERISA § 406(b), 29 U.S.C. § 1106(b), provides: "A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

179. Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(b).

180. Defendants violated each of the above prohibited transaction rules. Their inclusion of and failure to remove the imprudent funds from the Plan described above resulted from their "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any

transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

181.   At all relevant times during the Class Period, Defendants each acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan and as a result of the agreements among them.The Committee engaged in prohibited transactions by selecting the imprudent funds to earn profit for the broker at the expense of Plaintiff's retirement investments through excessive fees.

182.   Defendants failed to inform participants adequately of the risks of investing in the managed funds, and that the funds charged substantially higher fees than "readily available and comparable fund options."

183.   In doing so, Defendants dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

184.   In doing so, Defendants also acted adverse to the interests of the Plan and Plan participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

185.   And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plan, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

186.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

## PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint James Cecchi, Gary Klinger, and Alexandr Rudenco of the firm Milberg Coleman Bryson Phillips Grossman as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability.

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action.

H. Award pre-judgment and post-judgment interest.

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

J. Award such other relief as the Court may deem just and proper.

DATED: February 7, 2025              Respectfully submitted,


*/s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
P: 973-994-1700
jcecchi@carellabyrne.com

Gary M. Klinger*

51

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Alexandr Rudenco*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

*Pro Hac Vice Application forthcoming*

*Counsel for Plaintiff and
the Prospective Class*